SCOTT v. STEPHENSON.

Opinion delivered May 4, 1925.

1. APPEAL AND ERROR—CROSS-APPEAL AGAINST DEFENDANT NOT APPEALING.—A cross-appeal is not available, under Crawford & Moses' Dig., § 2166, against a defendant who is neither appellant nor coappellee; and, where such cross-appeal is asked more than six months after the date of the decree, it could not be treated as an orginal appeal.

2. INSANE PERSONS—SUITS ON BEHALF OF.—Under Crawford & Moses' Dig., § 1116, relating to suits on behalf of persons of unsound mind, even if the appointment of a guardian for an insane person by the probate court was void for want of jurisdiction, the chancery court had power to allow a suit by next friend of insane person against one receiving property from such incompetent under power of attorney.

3. INSANE PERSONS—VALIDITY OF DECREE IN SUIT FOR ACCOUNTING.—In a suit by a guardian of an insane person for an accounting against one receiving an incompetent's property, the fact that the court did not appoint a next friend of such person or otherwise disturb the status of the guardian, whose appointment was claimed to be illegal for lack of jurisdiction of the probate court, did not affect the validity of the decree.

4. INSANE PERSONS—AUTHORITY OF GUARDIAN.—While the power of an alleged guardian of an insane person to enforce a decree in

favor of his ward is affected by a question as to the validity of his appointment, such question became moot upon his being subsequently appointed guardian by a valid order.

5. PRINCIPAL AND AGENT—ACCOUNTING.—An agent should be required to account for the difference in amount collected on an endowment policy at maturity and the amount for which it was charged to her, for money received from timber sold, for excess in value over amount charged to her for stock sold, and for revenues received from the principal's estate.

6. PRINCIPAL AND AGENT—ACCOUNTING—INTEREST.—Where an agent made no investments of principal's property other than in worthless stock, he should account for interest at the highest legal rate on amount found to be due in her hands.

7. PRINCIPAL AND AGENT—ACCOUNTING.—An agent should not be charged for an automobile worn out in the service of the principal, where it was necessary for the latter's comfort.

8. PRINCIPAL AND AGENT—ACCOUNTING.—An agent receiving credit for the price paid for an automobile cannot include it in the list of property turned over.

9. PRINCIPAL AND AGENT—ACCOUNTING.—The fact that an agent, who had received credit for price paid for an automobile for use of the principal, turned it over to the principal's guardian, from whom she bought it second-hand for less than the original cost, did not justify excluding the full purchase price from the amount credited to such agent.

10. PRINCIPAL AND AGENT—ACCOUNTING.—In a suit against an agent for an accounting, she is not entitled to list, at more than par value, stock turned over to her at par value.

11. PRINCIPAL AND AGENT—ACCOUNTING.—In a suit against an agent for an accounting, she may be allowed credit for worthless securities bought in good faith where many people of the community made similar investments.

12. PRINCIPAL AND AGENT—ACCOUNTING.—In a suit against an agent for an accounting, she is entitled to credit for the price paid for tracts of land purchased for and turned over to her principal.

13. PRINCIPAL AND AGENT—ACCOUNTING.—In a suit against an agent for an accounting, she is not entitled to credit for rent notes for which there was no corresponding charge against her.

14. PRINCIPAL AND AGENT—RIGHT TO COMPENSATION.—An agent who made no proper use of her principal's estate, and who did not invest personal property except in worthless stocks, was not entitled to compensation.

15. MANDAMUS—DISCRETION OF COURT TO SET CASE FOR TRIAL.—On failure to show that the circuit judge refused to hear a proceeding by certiorari to quash an order of the probate court, man-

damus will not issue, since the matter of setting a case down for trial is a matter of discretion, which will not be controlled by the court.

Appeal from Drew Chancery Court; *E. G. Hám-mock,* Chancellor; reversed in part.

*Wilson & Norrell,* for appellant.

*Williamson, & Williamson,* for appellee.

McCULLOCH, C. J.   Ruth Harris, an adult female residing in Drew County, Arkansas, was, on March 5, 1923, adjudged by the probate court to be a person of unsound mind, unable to conduct her own business affairs, and Guy Stephenson was appointed by said court as the guardian of her estate.   On April 25, 1923, the Drew Probate Court adjudged, from testimony of physicians adduced before it, that it was best for the physical and mental welfare of Ruth Harris that she be placed in a sanatorium kept for the treatment of mental diseases, and, pursuant to that order, she was taken to a sanatorium in Cincinnati, Ohio, where she remained up to the time of the decree in this case and since.

The present action was instituted in the chancery court of Drew County on behalf of Ruth Harris, by Stephenson, as her guardian, against appellant, Mrs. Della Scott, to require her to account for the property of the ward received by appellant under power of attorney.   In the complaint it was charged that there was mismanagement and negligence on the part of appellant in the management, as well as a willful failure to account for the whole of the estate.   Appellant answered denying the charges of negligence and mismanagement, and alleged that she had turned over to the guardian the remainder of all the property which belonged to Miss Harris and which had come into her hands and control. Later, F. H. Scott, the husband of appellant, was made a party defendant on allegations that, among the assets of the estate of Miss Harris, there had been a mortgage executed by him to secure a debt for borrowed money

and that his wife, the appellant, had wrongfully and without consideration released the mortgage.

A final decree was rendered in the case on December 11, 1923, in favor of appellee against appellant, Mrs. Scott, for the recovery of the sum of $14,674.40 and all costs of the action. Mrs. Scott appealed from that decree, and appellee has cross-appealed. There is nothing in the record to show that the effort to secure relief against F. H. Scott was pressed before the court, and nothing is said in the decree on that feature of the case. Appellee requested and obtained a cross-appeal against F. H. Scott, but, as Scott was neither an appellant nor a co-appellee, a cross-appeal against him was not available under the statute. Crawford & Moses' Digest, § 2166. The cross-appeal was asked for too late (more than six months after the date of the decree) to be treated as an original appeal. Hence the only questions to be determined on the appeal and cross-appeal relate to the right of recovery against appellant, Mrs. Scott.

After the rendition of the decree against appellant, but at the same term of court, appellant filed in the lower court a motion to vacate the decree on the ground that the order of the probate court adjudging Ruth Harris to be insane and appointing Stephenson as guardian was void and of no effect. Before the court passed upon this motion the probate court of Drew County made another adjudication to the effect that Ruth Harris was a person of unsound mind, then being confined in a sanatorium in Cincinnati, Ohio, and Guy Stephenson was reappointed as her guardian. The record of that additional proceeding in the probate court was filed in response to appellant's motion to vacate the decree, and the court overruled the motion to vacate the decree, and there has been an appeal from that order or decree.

It is insisted by counsel for appellant that the decree should be reversed and the cause dismissed on the ground that the record of the probate court adjudging

the insanity of Ruth Harris and appointing the guardian was void for want of jurisdiction in that court.   Counsel rely upon the decision of this court in *Monks v. Duffle,* 163 Ark. 118, holding that an adjudication of insanity by the probate court without having the person before the court is void.   We deem it unnecessary, however, to enter upon a discussion of the question of the validity or invalidity of the original order of the probate court, for the validity of the decree of the chancery court could not be assailed on the ground that the order appointing the guardian was void.   The invalidity of the order did not affect the jurisdiction of the chancery court.   An action brought by a guardian or a next friend of a person under disability, is, in effect, a suit by such person under disability, and a change in the character of the representative does not operate as a change of parties, for, as before stated, the person under disability is the real party, and not the representative.   Our statute provides that an action on behalf of a person judicially found to be of unsound mind must be brought by his guardian, or, if he has none, by his next friend, and that, when the action is brought by the next friend, it is subject to the power of the court.   Crawford & Moses' Digest, § 1116.   The jurisdiction of the chancery court over the subject-matter of litigation and of the persons of the respective parties draws to it jurisdiction to inquire into the status of the parties and of the representatives who appear for them.   Hence it follows that, if there was no legally appointed guardian, or, in other words, if the appointment of the guardian was void for want of jurisdiction of the probate court, it was within the jurisdiction and power of the chancery court to permit the action to be prosecuted by a next friend.   *Peters* v. *Townsend,* 93 Ark. 103.   If the question had been raised before decree, and the invalidity of the appointment shown, it would have been the duty of the court to inquire into the fact whether or not the plaintiff was a person of unsound mind, and, if found

so to be, to permit the action to continue in the name of some person as next friend. The fact that the court did not appoint a next friend or otherwise disturb the status of Stephenson as guardian does not affect the validity of the decree. It would have constituted no encroachment upon the jurisdiction of the probate court for the chancery court to inquire into the status of the plaintiff, Ruth Harris, to determine whether or not the action in her behalf could be prosecuted by a representative instead of in her own name. *Peters* v. *Townsend, supra.* Of course, the right to enforce the decree in the name of the guardian is affected by the question of the validity of his appointment, but the question of the enforcement of the decree is not involved in this appeal, and, besides that, it has become entirely moot, for the reason that, since the question was raised by a motion to vacate the decree below, there has been a valid adjudication of the insanity of Ruth Harris and another appointment as guardian. One of the sections of the statute regulating the appointment of guardians for insane persons reads as follows: "Section 5837. Whenever any insane person is confined in the insane asylum of this State or in any institution or asylum for the insane outside of the State, the probate court of the county of which such person is a citizen and resident shall have power to appoint a guardian for such person, without requiring the presence of such person before the court." Crawford & Moses' Digest.

When the last order was made reappointing the guardian for Ruth Harris, she was, according to the undisputed proof, in an asylum or sanatorium for the care and treatment of insane persons outside of the State, and the presentation of a petition to the court conferred jurisdiction to hear and determine the question of insanity. If there was any fraud practiced upon the court or upon the insane person by causing her to be removed from the State, so that the court could acquire jurisdiction without her presence in open court, that

could be shown in a direct attack to set aside the judgment of the probate court or by an appeal in apt time from the order. There is, however, no intimation in the present record of such a state of facts. There is no suggestion anywhere in the record that the conduct of the guardian towards Miss Harris, or of her kindred who instituted the proceedings, was prompted by other than a purpose to best serve her interests. The last order is therefore valid.

There remains yet to consider the merits of the litigation. Appellant is the mother of Ruth Harris. She was formerly the wife of A. E. Harris, who died in the year 1892, shortly after the birth of his daughter Ruth. C. T. Harris, a brother of A. E. Harris, became the guardian of the infant Ruth by appointment from the probate court, and he continued to be her guardian until she became of age, and he made his final settlement in the year 1910. A. E. Harris left considerable property, of which Ruth inherited her portion, consisting mostly of land. The settlement accounts of A. E. Harris show that, when the guardianship began, he had in his possession, in addition to the real estate of his ward, personal property of the value of $2,790.94, and that, by careful attention and judicious management, he turned over to his ward at the end of his guardianship the sum of $38,357.51.

Ruth Harris, upon coming of age and receiving from her guardian her inheritance, executed to her former guardian, C. T. Harris, a power of attorney authorizing him to manage her property, which he continued to do until March 11, 1918. Miss Harris and her mother, the appellant, joined in an action in the chancery court to cancel the power of attorney formerly executed by Ruth to her former guardian, and the chancery court granted the prayer of the complaint, and canceled the instrument. At that time Miss Harris had executed another power of attorney to her mother, the appellant, revoking the former power to her uncle and authoriz-

ing her mother to receive and manage her estate. Upon the rendition of the decree of the chancery court canceling the power of attorney to Mr. Harris, he turned over all the property to appellant as the agent and attorney in fact of his former ward. In addition to the real estate turned over to appellant, Mr. Harris delivered to her personal property to the amount of $40,420.05. This consisted of the sum of $12,679.25, money deposited in bank, and the remainder in bank stock, an endowment insurance policy, and notes for money loaned and secured by mortgages on real estate. The whole estate was of unquestioned value of the amount named and all consisted of what, in banking circles, would be termed liquid assets, except an item of $1,000 for an automobile. Part of the assets consisted of forty shares of preferred stock in a corporation known as the Monticello Cotton Mills, of par value of $1,100, and also eighty shares of the Union Bank & Trust Company, of a par value of $4,000. These two items are specially mentioned because they have been subsequently returned by appellant to the guardian of Miss Harris.

Appellant, upon receiving the property of her daughter from C. T. Harris on March 11, 1918, began the management of the estate, and continued to manage it until the probate court of Drew County made the first order adjudging Miss Harris to be insane, and appointing her guardian, when, in compliance with the order of the probate court, she delivered to the guardian the property which she conceded that she had in her hands belonging to Miss Harris.

Appellant had, during her stewardship, purchased two additional tracts of land for Miss Harris, situated in Drew County, near Monticello, and these were turned over to the guardian, and appellant, of course, claimed credit in her settlement for the amount paid for those tracts of land. She also turned over to the guardian bank stock and cotton oil stock of the par value of $5,100, as hereinbefore stated, and also corporation

stock of the par value of $4,687.50, conceded to be worth-
less. These were oil and gas stocks, with the exception
of $350 in a defunct grocery company, and $1,000 in a
defunct lumber company. , She claimed credit also for
a new automobile recently purchased for Miss Harris at
the price of $1,900. There were several other items,
consisting of rent notes and a few other notes. The
aggregate amount of the personal property thus turned
over, as estimated by appellant herself, was $14,720.50.
This included the worthless oil stock at its par. value.
Appellant also rendered an account showing that she had
received during the five years of her stewardship gross
revenues to the amount of $7,022.50, which included all
rents received and dividends on stock. She also
accounted for amounts received on the various securities
originally delivered to her by C. T. Harris. She claimed
credit for amounts expended for the use of Miss Harris,
showing a total expenditure of $27,953.29 for the five
years, including $500 a year as compensation for her own
services.

The evidence shows that Miss Harris spent most of
her time at sanatoriums and other institutions for treat-
ment of those who are physically and mentally ill, and
the account rendered by appellant, if correct, shows that
all the places were very expensive. For instance, there
is an item of expense of $1,000 for a trip of Miss Harris
and a nurse from Monticello to Memphis and from
Memphis to Baltimore, including railroad fare, hotel
bills, doctors' fees and hospital fees. There is an
item of $2,300 for about six months' treatment at
Flint, Michigan. The account contains credit also for
taxes and insurance and for certain improvements made
on a store building in Monticello and the cost of build-
ing a new house on one of the farms owned by Miss
Harris.

An attack is made by appellee on the accounts of
appellant, both as to the amount of revenues received
and also the expenditures made on behalf of the ward.

The proof shows on the part of appellee and the direct testimony of Mr. C. T. Harris that, for several years before he turned over the property and estate to appellant, it had been yielding a net revenue of about $6,000 a year, and that he had paid lavish expenses for Miss Harris out of the revenues, and still the personal estate had increased from year to year. The showing made by appellant for the five years is an average of about $1,400 a year revenue, and this consists of rents on store building, $600 a year, and the farms and dividends on corporation stock which had been turned over to her by Miss Harris. There is no account of revenues from investments made of the other personal estate, particularly money turned over to her by Miss Harris.

The proof on the part of appellee shows that the expenses of Miss Harris were much less under the management of her uncle, the former guardian, who allowed her to spend money lavishly, and everything reasonable was provided for her comfort and luxury.

The evidence shows very clearly, we think, poor management on the part of appellant. She could have realized more from the estate if she had exercised proper care. It would serve no useful purpose and would extend this opinion too far to discuss all the items in the various accounts, so we devote the discussion to the particular items, which we think, must be controlled by the decision.

Appellant must, of course, be charged with the gross amount of personalty which she received from C. T. Harris, conceded to be the total sum of $40,327.50. This included an endowment policy in one of the standard life insurance companies, and was listed in the above valuation at $2,472, whereas the proof shows that appellant collected on this policy at its maturity the sum of $4,200. She should be chargeable with the difference of $1,728 not included in the amount turned over to her by Mr. Harris. It is undisputed that she sold timber on the lands of the ward, receiving in cash the sum of $2,700.

She, of course, must be charged with that amount, which is not included in the list of personal items turned over to her by C. T. Harris. The proof shows that she sold stock in a certain bank in Little Rock, which had been turned over to her, for the sum of $750 in excess of the par value at which it was listed in the inventory made to her by Mr. Harris. She should be charged with that item. The revenues received by her in the sum of $7,022.50, as shown by her own account, should of course be charged to her. These items aggregate the sum of $52,528. The question whether or not she should be charged with additional revenues which she ought to have received from the estate is a difficult one. The proof is not especially directed to the question whether or not she could have received more rent on the farm lands or on the store building in Monticello. There is no effort made on the part of appellee to prove that she could have received more rent, and all that the proof shows and all that was attempted to be shown is that appellant had secured no returns from investments other than on the stocks which had been turned over to her by Mr. Harris, and that she made no use of the available cash on deposit which was turned over to her, and the collections on outstanding mortgages. All the investments that she made were in worthless stocks, which yielded no return. We have concluded that there is no proof which would justify us in finding any specific amount which should have been received on investments, but we are of the opinion that because of the fact that appellant made no investments other than in worthless stocks, she should account for interest at the highest rate on the amount found to be due in her hands at the time of the decree. That amount will be stated at the conclusion of the discussion when arriving at the amount due.

The next thing to be considered is the amount of credits which should be allowed appellant. She is charged in the account with $1,000 for an automobile, turned over by the former guardian for the use of Miss

Harris. It is shown that Miss Harris was provided with automobiles, both by Mr. Harris and by appellant, and that no question was raised as to their being a proper item of charge. It is conceded that it was necessary for Miss Harris' comfort to have an automobile. This one which was turned over by the former guardian to appellant was used and worn out in the service of Miss Harris, and it should not be charged to appellant in the account.

Shortly before appellant surrendered the estate to the guardian she purchased a new automobile at a cost of $1,900, and this was part of the estate that she turned over to the guardian. She claimed credit for the full amount of the price of the automobile, and, of course, it should not be again included in the list of property turned over to the guardian, as the effect of that would be to give her credit for the amount twice. It is contended by counsel for appellee that she should not receive credit for the full price of the automobile, for the reason that she purchased it back from the guardian for the sum of $750. That is a matter between appellant and the guardian and the probate court. The fact that she bought the car back from the guardian, after it had been used, for a price less than the original cost does not justify excluding the full purchase price from the amount to be credited to appellant.

Appellant in her account puts in the bank stock and the cotton mill stock which was returned to the guardian at a higher par value than that listed in the inventory of the property turned over to her by the former guardian and with which she stands charged. In order to balance the account, her credit must be simply for the amount of the original par value, $5,100.

The question of allowance of credit for the worthless stock is a matter which gives us much concern. It is conceded that the stocks are worthless, but the proof shows that many people, including business men of that community, made similar investments. From the present viewpoint, investments in that character of securities

were obviously improvident, but, considering all the circumstances of the case, we find nothing that will justify the conclusion that appellant's conduct was in bad faith, and we have concluded that she should be allowed credit for the amount paid for these stocks, notwithstanding the fact that they proved worthless.

She is also entitled to credit for the price paid for the additional tracts of land which she purchased for Miss Harris and turned over to the guardian.

Appellant is not entitled to credit for rent notes for the year 1923, for there was no corresponding charge against her for those items, and they were not collectable until after her stewardship ended.

Notwithstanding many of the apparently exorbitant items in appellant's account for living expenses and traveling expenses and expenses of medical treatment for Miss Harris, we have concluded to let the account stand as rendered, with the exception of the item of $500 for each year's compensation to appellant for her services. The chancellor took this view of the account, and we accept his finding as not against the preponderance of the evidence. Appellant made no proper use of the estate of her principal, she made no investment of the personal property except in worthless stocks, as before stated, and she earned no compensation, and is entitled to none. *Greer* v. *Craig,* 165 Ark. 209. It is an elemental principle of law that an unfaithful agent is entitled to no compensation for services rendered. The deduction of $2,500 reduces appellant's account to the sum of $25,453.29 and makes the total credits aggregate the sum of $39,990.79. Deducting this from the amount of total debits against appellant, $52,528, leaves a balance unaccounted for of $12,537.21. Interest on this sum at ten per cent. per annum from March 11, 1918, to the date of the decree on December 11, 1923, makes $7,209.04, and, adding this to the amount found to be in the hands of appellant, it makes an aggregate of $19,747.25. A statement of the account is tabulated as follows:

Debits Against Appellant.

| | | |
|---|---:|---:|
| Personalty delivered to Mrs. Scott by guardian | $40,327.50 | |
| Additional amount collected on life policy | 1,728.00 | |
| Amount collected on sales of timber | 2,700.00 | |
| Additional amount collected on sale of bank stock | 750.00 | |
| Receipts 1918-1922 | 7,022.50 | $52,528.00 |

CREDITS.

| | | |
|---|---:|---:|
| Inventory price of old automobile | $ 1,000.00 | |
| Bank stock and mill stock returned to guardian | 5,100.00 | |
| Worthless stock returned to guardian | 4,687.50 | |
| Price 2 tracts of land bought for ward | 3,750.00 | |
| Account against ward for 1918-1923, less claimed compensation | 25,453.29 | 39,990.79 |
| | | |
| Balance due ward | | 12,537.21 |
| Add interest from Mar. 11, 1918, to Dec. 11, 1923, at 10 per cent, 5 yrs. 9 mos. | | 7,209.04 |
| | | $19,746.25 |

The decree will therefore be reversed on the cross-appeal of appellee, and judgment will be entered here in favor of appellee against appellant for the sum mentioned above ($19,746.25) with interest at the legal rate (6 per cent. per annum) from the date of the decree below.

Appellant has also filed a petition here for a mandamus against the circuit judge to compel him to hear a proceeding instituted in that court by writ of certiorari, to quash the order of the probate court. It appears from appellant's petition for mandamus and the

statements of counsel here that the circuit judge acted under the conception that the question of the validity of the probate proceedings was involved in the present appeal from the decree in the civil case, and, for that reason, postponed any hearing in the circuit court until this court could reach and dispose of the civil case. There is no showing that he has absolutely refused to hear the proceedings in his court. Counsel rely on the decision of this court in *Road Improvement District* v. *Henderson*, 155 Ark. 488, as supporting their contention that the circuit judge should be compelled to give an immediate hearing of the proceedings in his court. That case has no application, as is shown by the decision in the more recent case of *Village Creek Drainage District* v. *Ivie, ante* p. 523. The question of setting a time for trial is a matter of discretion, and such discretion will not be controlled by this court by mandamus. The prayer of the petition is therefore denied.